**EOD**

03/29/2011

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| PAULA HOLLIS, | § | Case No. 09-40483 |
| | § | (Chapter 7) |
| Debtor. | § | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | § | |
| | § | |
| GREGORY A. HOLLIS and | § | |
| JAMES HOLLIS, | | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adv. Proc. No. 09-4066 |
| | § | |
| PAULA HOLLIS, | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

The Plaintiffs, Gregory Hollis, as a beneficiary of the Ralph & Paula Hollis Family Trust, and James Hollis, as a trustee of the Trust, commenced this adversary proceeding by filing a Complaint Concerning Dischargeability against the Debtor-Defendant, Paula Hollis.  Generally, the Complaint arises from the Debtor's alleged breach of her fiduciary duty as a co-trustee of the Trust.  As a result of the alleged misconduct, the Plaintiffs assert that the Debtor is indebted to Gregory for damages in excess of $500,000, that the Debtor is obliged to pay their attorneys' fees, and that her obligations are nondischargeable under § 523(a)(4) of the Bankruptcy Code.

## I.  BACKGROUND

### A. The Parties to the Dispute

Paula Sanders married Ralph Hollis on December 17, 1988.  Paula was a 31-year-

1

old aspiring lawyer, and Ralph was a 50-year-old business owner. They each had one child from a prior marriage. Paula was raising her minor daughter, Kindel, while attending law school. Ralph had recently divorced, and his only child, Gregory Hollis, was an adult.

Paula and Ralph executed a pre-nuptial agreement on their wedding date. The pre-nuptial agreement provided that their separate property would remain separate. Paula's separate property consisted of her home located at 2216 Statler Drive in Carrollton, Texas, several bank accounts holding small sums of money, the furniture and household goods located in her home, clothing, jewelry, and other personal effects. Ralph's separate property included his home located at 3833 Kelley Boulevard in Carrollton, Texas, his ownership interest in several businesses, including 800 shares of Hollis Business Forms, Inc. d/b/a HBF Graphics ("HBF"),[1] his interest in HBF's employee profit sharing and pension plan dated May 1, 1989, an IRA account number 586-22497 at Merrill Lynch, and an IRA account number 093320463547831 at N.C.N.B.

Paula graduated from law school in May 1990 with Ralph's financial assistance. After she obtained her license to practice law, Ralph allowed her to use one of the offices at the warehouse where HBF conducted its business. Paula filed articles of incorporation for Paula Sanders Hollis, Inc. on June 13, 1991.

Paula testified that she was a solo practitioner for a few years. Paula testified that she has attended numerous continuing legal education courses regarding the law of wills, trust and probate, and she professes to specialize in these areas of legal practice. At the

---

[1] Paula Hollis testified that Hollis Business Forms originally issued 1000 shares, 800 to Ralph and 200 to Ralph's business partner, Irving Stern. She testified that, at some point during their marriage, Ralph bought out Mr. Stern by paying him $300,000 for his 200 shares of Hollis Business Forms. She testified that Mr. Stern is dead. Neither Mr. Stern nor his heirs have had any role in the present dispute.

2

time of trial, however, she was unemployed. Her bankruptcy schedules reflect that her sole income was disability payments form the Social Security Administration when she filed her chapter 7 petition.

### B. The Will and Trust

Approximately a year after marrying Paula, on November 5, 1989, Ralph Hollis executed a Will. His Will left his house, his personal property (specifically including all furniture, guitars, guns, clothing and books), 80% of 800 shares of HBF, and 2/3 of the IRA located at N.C.N.B., among other things, to Paula. His Will left the remaining 20% of the 800 shares of HBF to his son, Gregory, as well as the remaining 1/3 of his IRA located at N.C.N.B., among other things. According to his Will, the IRA at N.C.N.B. consisted of a certificate of deposit in the principal amount of $10,338.65. Ralph's Will designated Paula as the executrix.

At or around the time that Ralph Hollis created his Will, Ralph and Paula Hollis retained counsel to draw up a family trust for the benefit of their existing children (Gregory and Kindel) and any children they might have in the future. They executed the "Ralph and Paula Hollis Family Trust" on December 29, 1989.[2] They signed the Trust as settlors, and Ralph Hollis also signed as trustee. The Trust attached a "Schedule A," which detailed the property treated by the Trust.

The Trust provided for the conveyance of Ralph's separate property into the Trust, including his home located at 3833 Kelley Boulevard, 800 shares of HBF, HBF's

---

[2] The Trust references the powers granted to trustees under the Texas Trust Act. However, the Texas legislature had repealed the Texas Trust Act prior to the creation of the Trust. The Texas Legislature adopted the Texas Trust Code in 1983 as part of its nonsubstantive revisions codifying statutes relating to property. Act of May 26, 1983, 68th Leg., R.S., ch. 576, 1983 Tex. Gen. Laws 3475. The Trust Code codified the former Texas Trust Act enacted originally in 1943. Act of April 15, 1943, 48th Leg., R.S., ch. 148, 1943 Tex. Gen. Laws 232.

profit sharing and pension plan no. 44-0662-00-5 located at Texas American Bridge Bank, and the IRA account number 093320463547831 located at N.C.N.B. The Trust also provided for the conveyance into the Trust of a ½ interest in Paula's home.

The Trust originally provided that Ralph's interest in HBF would be offered to his business associate, Larry Claypool, at a sales price of $300,000, in the event of Ralph's death. The proceeds from this sale along with Ralph's remaining separate property would be distributed ¼ to Gregory Hollis and ¾ to Kindel Ashley Richardson and any children thereafter born to the settlors.

HBF conducted a special meeting of its board of directors, Ralph Hollis and Larry Claypool, on or about January 1, 1990. The minutes of this meeting reflect that Ralph advised the board that he had conveyed his interest in HBF into the Trust for one dollar. The minutes further reflect that HBF resolved to transfer Ralph's 800 shares of stock in HBF to the Ralph and Paula Hollis Family Trust.

On January 31, 1990, Ralph Hollis executed a Warranty Deed relating to the home on Kelly Boulevard. The Warranty Deed reflected that he had conveyed his interest in the home into the Trust for the nominal sum of $1. The Warranty Deed was recorded in the real property records on February 5, 1990.

On January 31, 1992, Ralph Hollis executed another Warranty Deed relating to the home on Kelly Boulevard. The second Warranty Deed reflected that Ralph Hollis, as trustee of the Trust, had conveyed the home back to himself, individually, for the sum of $1. The second Warranty Deed was recorded in the real property records on August 27, 1992. Several weeks later, on September 23, 1992, Ralph and Paula Hollis executed

4

documents relating to the refinancing of the mortgage debt for the home on Kelly Boulevard. In 1994, they re-conveyed the house on Kelly Boulevard to the Trust.

Paula Hollis prepared an amendment to the Trust dated March 2, 1992. The amendment made Paula Hollis a co-trustee with her husband. The amendment also added their newborn son, Timothy Hollis, as a beneficiary of the Trust. Ralph and Paula Hollis signed the amendment as settlors and co-trustees.

As modified, the Trust provided for the appointment of two co-trustees in the event of the death of Ralph or Paula Hollis. The amendment expressly designated Lynda Wakefield, who was Paula's friend, and James Hollis, who was Ralph's brother, as co-trustees in the event of Ralph or Paula's death. The Trust contained the following provisions for distributions after the death of the first of the settlors:

> (a) Income Distributions. The trustee shall distribute to the surviving Settlor, Gregory A. Hollis, Kindel Ashley Richardson and Timothy Aeron Hollis or their descendants so much of the remaining net income of the Trust estate as the trustee may deem necessary or reasonable to provide for their health, education, maintenance and support. In exercising his discretion with respect to distributions, the trustee shall consider all other sources of income available to any beneficiary. Any distributions under this paragraph shall not be charged against their presumptive shares of the trust.
>
> (b) Principal Distributions. If at any time during the term of this trust, the net income which is distributed under the terms hereof, shall not be adequate for the necessary or reasonable education, health, maintenance and support of any beneficiary of the trust to whom income is distributable, considering all other sources of income available to such beneficiary, the trustee in his absolute and sole discretion, may supplement the same out of the principle of the trust to such and extent and in such manner as is necessary or reasonable for such purpose. The amount of such supplemental distribution shall not be charged against the presumptive share, if any, of the beneficiary of the trust receiving same.

The amendment eliminated the proposal to sell Ralph's interest in HBF to his business associate for $300,000. The amendment also altered the distribution of Ralph

5

Hollis' separate property, providing that 1/8 would be distributed to Gregory Hollis and 7/8 to Kindel and Timothy. The amendment reflects that Ralph had moved his IRA from N.C.N.B. to First Gibralter Bank. The amendment also reflects that Ralph had moved HBF's profit sharing and pension plan from Texas American Bridge Bank to Merrill Lynch account no. 586-05A52.

In the amendment, Paula represented that she was contributing 1,000 shares of Paula Sanders Hollis, Inc. to the Trust. The amendment stated that these shares would be "held, managed, invested, and distributed as part of the trust fund created by the trust agreement." Paula testified that she later discovered in a continuing education seminar that it would be illegal to transfer an interest in her "professional corporation" into the Trust. Paula testified that she never actually transferred any shares of her "professional corporation" to the Trust.

On February 2, 1993, Ralph established an IRA account number 586-80188 at Merrill Lynch by signing an "IRA Adoption Agreement." The agreement lists the account holder as Ralph Hollis, designates Paula Hollis as the 100% beneficiary of the account, and describes Paula's relationship with Ralph as his wife. The parties have not established the source of funding for this IRA, but it may have some historical relationship to the Merrill Lynch IRA account number 586-22497 described in the pre-nuptial agreement between Ralph and Paula. Ralph closed IRA account number 586-22497 at some point, and neither IRA account number 586-22497 nor IRA account number 586-80188 was addressed in the Will or the Trust.

6

### C. The Events Surrounding the Death of Ralph Hollis

Ralph told Gregory, in general terms, about the Will and the Trust.  In particular, Ralph told Gregory that he had created the Trust for the benefit of Gregory, Kindel, and Timothy.  Ralph told Gregory that he anticipated that Gregory would receive payments from the Trust of $10,000 a year for several years after Ralph's death.  Ralph told Gregory that Paula would be running the Trust, but that his uncle, James Hollis, and Lynda Wakefield were co-trustees who would be keeping an eye on Paula.

Gregory Hollis went to work as a salesman for HBF in March 1999.  Gregory negotiated the terms of his employment with his father.  Pursuant to a written contract of employment dated March 4, 1999, Gregory received a base salary of $37,500 with the possibility of a bonus.  In addition, since Gregory did not have a vehicle at the time, HBF provided Gregory with a company vehicle and paid for his gas.

HBF was a distributor of commercial business forms.  It was a small company that employed only two people other than Gregory and Ralph Hollis – a receptionist and a computer technician.[3]  Paula Hollis held the title of president of the company beginning on November 1, 1997, but her duties primarily consisted of issuing and signing checks at her husband's direction and making minor decisions in her husband's absence.  HBF made payments to Paula's mother, Helen Sanders, but it is unclear from the record whether Mrs. Sanders actually did any work for the company.

Gregory believed that he had been hired to eventually take over for his father, whose health was in decline.  Indeed, after Gregory began working for HBF in March 1999, his father described himself to customers as semi-retired.  Gregory understood the agreement was that he would work for his father for seven years.  During that period, his

---

[3] Ralph had recently fired HBF's bookkeeper and accused her of embezzling from the company.

bonuses would be directed toward purchasing the shares of HBF.  He understood that he would own HBF at the end of seven years.

Ralph Hollis slipped into a coma on or around July 10, 1999, and he passed away on July 17, 1999.  Ralph left behind significant assets, including the home where he and Paula lived, his interest in HBF, and several IRAs.  The largest IRA, by far, was account number 586-80188 at Merrill Lynch.  The account statements reflect that, as of July 30, 1999, IRA account number 586-80188 had a balance of $1,091,939.

According to Paula's testimony at trial, Gregory stopped coming to work as soon as his father got sick.  She testified that he confronted her while Ralph was in a coma, demanding that she increase his pay.  Paula testified that he screamed at her, threatened her, and quit when she refused to give him more money.  She also claims that he used the company's credit card without permission during the days prior to his father's funeral. According to Paula, Gregory and Ralph's relationship had begun deteriorating in 1991, when she had to threaten Gregory with a lawsuit so that Gregory would allow Ralph to see his two grandchildren.

Paula's version of these events is completely, irreconcilably different than the version offered by Gregory.  The Court, having observed Paula's demeanor, reviewed the documentary evidence, and considered the conflicting testimony of Paula and Gregory, finds that Paula's version of events is not credible.  Rather, Ralph's death brought out her true colors.

Gregory Hollis testified, credibly, that he had enjoyed a cordial relationship with Paula prior to his father's death.  She had occasionally offered him legal advice regarding

8

his financial and other difficulties.  She even provided him with financial assistance so that he could file for bankruptcy at one point.

Gregory admitted that his work schedule had prevented him and his family from seeing as much of his father as he would have liked during 1991, but he testified that he resolved this issue by taking a part-time job with HBF, among other things.  Paula's testimony that she or Ralph threatened to sue Gregory in 1991 in order to obtain the right to visit with Gregory's two daughters was not credible or supported by any evidence other than Paula's self-serving statements.  Gregory Hollis testified, credibly, that he and his father enjoyed a close relationship before and after 1991.

After his father died, Gregory approached Paula to ask for a favor.  Gregory's wife and daughters did not have any clothes appropriate for the funeral, and they needed haircuts and new shoes.  Gregory testified, credibly, that he was deeply in debt when his father died.  Paula gave him the company credit card and told him to use it for what he needed.  She told Gregory that she would deduct the charges from his distribution from his father's estate.  Gregory used the card several times over the next week at stores such as Payless Shoes.  Although he knew Paula would receive the monthly account statement for the company's credit card, he prepared a hand-written accounting of the charges for Paula.[4]

Gregory Hollis testified that he respectfully refrained from approaching Paula about the Will or Trust until after his father's funeral.  He testified that he eventually approached Paula at the office to ask when the Will would be read.  Gregory's testimony about what happened next was credible and consistent with his prior testimony as well as

---

[4] In her correspondence with James Hollis, Paula accused Gregory of using his father's credit card without permission and attempting to open new credit in his father's name.  Paula's accusations of misconduct are not supported by documentary evidence or credible testimony.

the documentary evidence.  Paula responded that the Will would not be read, that Gregory was not even mentioned in the Will, that he was not a beneficiary under the Trust, that he had nothing coming to him, and that his father had been angry with him since 1991.  Paula stated that, because she wanted to be nice, she planned to distribute $10,000 a year to Gregory if everything worked out.  Gregory testified that he was hurt and confused by her statements, and he demanded to see the Will and Trust.  Paula refused.  Gregory admitted raising his voice during the discussion.

### D. Paula Hollis Takes Control of Hollis Business Forms

Gregory continued working for HBF for several months after his father's death. He continued to ask for a copy of the Will and the Trust instrument, and Paula continued to ignore him, refuse, or promise to get him the documents at some future time.  Paula told him that she was going to try to sell HBF, and in letters she wrote later, she stated that Gregory's continued employment was critical to the value of the business since he was familiar with all of the customers.

At a meeting on August 27, 1999, Paula told Gregory that she was planning to sell HBF to F&E Business Forms.  Paula stated that even though the Trust did not require any distribution to Gregory, she could make distributions at her discretion.  She stated that she intended to exercise her discretion to make distributions to Gregory.  She also represented that she would try to find Gregory a place at F&E Business Forms.

In connection with her duties as the executrix of Ralph's Will, Paula obtained an appraisal of HBF as of July 19, 1999.  The appraiser visited the company's offices and warehouse on January 11, 2000.  Based on his conversations with Paula and his review of the company's financial information through June 30, 1999, the appraiser valued the

company at $385,000 net a lack of liquidity discount of 10%. The appraiser suggested that Paula should use this figure as a benchmark in evaluating offers to purchase HBF. The appraisal assumed that no significant changes had or would occur at HBF with respect to HBF's financial performance.

Paula apparently did not inform the appraiser of significant changes that had already occurred. In particular, Paula had fired Gregory on September 20, 1999. She represented to Gregory that she was letting him go because F&E Business Forms did not have a place for him. She offered him either the vehicle he had been driving or $5,000 as a severance. Gregory testified, credibly, that he took the cash. Gregory testified that Paula hugged him as he left, and one of the two remaining employees of HBF drove him home with Paula's permission.

Paula did not sell HBF to F&E Business forms. With Gregory's departure, there was no one left with any knowledge of the clients serviced by HBF. HBF withered away over the following months and years. The net profit from operations dropped from approximately $12,500 during the month of Ralph's death to a loss of nearly $17,000 for November 1999. The monthly operating reports also show that the amount of cash in HBF's bank account declined precipitously after Paula fired Gregory.

Paula retained counsel, John Paul Kelly, to assist her in settling Ralph's affairs. Paula used HBF's operating account to pay Mr. Kelly's professional fees. On March 8, 2000, Mr. Kelley sent a letter to Gregory with a copy of the Will. Mr. Kelly explained to Gregory that the various gifts to him under the Will had lapsed or were governed by contractual beneficiary designations. Thus, according to Mr. Kelly, all Gregory was entitled to under the Will was $1.

On April 3, 2000, Gregory sent a letter to Paula.  He thanked her for providing him with a copy of the Will.  He formally requested $10,000 per year from the Trust, which he explained was his understanding of what he was entitled to receive.  He also requested a copy of the Trust instrument, among other things.  Paula did not provide him with a copy of the Trust instrument or distribute any income to him.

Paula continued to operate HBF during 2000 and 2001.  She used a company car for her personal vehicle, and she obtained health insurance for her family through the company.  Although the company was operating at a loss, HBF's ledgers reflect that Paula paid herself an occasional salary as president of HBF.  The amounts she withdrew, if any, varied from month to month.

In October 2001, Paula signed a Management Agreement with Larry McClinton, which authorized him to take over HBF's remaining accounts.  Mr. McClinton was an employee of American Business Forms.  The Management Agreement provided that the bulk of any profits would be distributed to Mr. McClinton and American Business Forms.  The remainder, ranging from 18% - 30%, would be distributed to HBF.

**E. Paula Hollis Takes Control of the Trust**

The corpus of the Trust has been a subject of dispute among the parties.  Paula was the only party with a copy of the document creating the Trust when Ralph died.  Although she and Ralph had previously asked James Hollis to serve as co-trustee, they had not provided James with a copy of the document creating the Trust or any information regarding its corpus.  Paula initially took the position that everything in the Trust was hers to spend as she liked.

Gregory Hollis eventually retained counsel to ascertain his interests, if any, with respect to the Trust. He had already discovered that Paula had lied about the contents of his father's Will when she told him that he was not even mentioned in it, and he had some reasonable doubt about the accuracy of her representations that he was not entitled to anything under the Trust. On February 19, 2001, Gregory's counsel sent a letter to Paula's counsel requesting a copy of the instrument creating the Trust.

Paula did not immediately send Gregory a copy of the Trust instrument. Rather, she sent a letter to Gregory's counsel dated February 27, 2001, in which she stated that "the only trust asset is the stock of Hollis Business Forms, Inc. which is not income producing." She represented that she had already explained to Gregory that she was not a trustee of the Trust, and that she had already told him to direct his questions to the trustees, "one of which is his uncle, James Hollis." She stated that the Trust has "confidential information that pertains to my children," and she had "no desire to incur any expense in relation to some delusion that Gregory has that he stands to inherit any amount of money."

In her letter, Paula directed Gregory's attorney to advise Gregory of his possible criminal liability for his fraudulent use of HBF's credit card to pay for his expenses relating to his father's funeral. She also suggested that Gregory had damaged HBF by attempting to start a competing business. Paula enclosed the one dollar that Gregory was entitled to under the Will.

Gregory's counsel responded in a letter dated March 27, 2001. Among other things, he challenged Paula's claim that the HBF's stock was the only asset of the Trust. Gregory's counsel informed Paula that the Denton County tax records showed that the

house located at 3833 Kelly Boulevard – where she was living – was owned by the Trust. On April 11, 2001, Gregory's counsel filed a petition in the probate court seeking to depose Paula in order to investigate a potential claim against her.

Paula and Gregory sparred through their respective legal counsel for the next several months. In the meantime, Paula's counsel sent a belated letter to James Hollis as co-trustee of the Trust. The letter, which was dated April 10, 2001, enclosed a copy of the Trust instrument as well as a "Notice of Vacancy in Office of Trustee and Appointment of Successor Trustee." Paula's counsel instructed James Hollis to mark on the Notice his acceptance or refusal to act as a co-trustee for the Trust. James promptly fulfilled his promise to his brother by accepting.

James testified, credibly, that Paula let him know from the beginning that she was the "head" trustee. Paula represented to James that Kindel could and should get everything under the Trust to pay for her college education. Paula responded hostilely to every question James raised about the expenses she claimed for Kindel. Paula repeatedly told James that it was her money in the Trust, and she consistently stated to James and everyone else that Gregory had nothing coming to him under the Trust.

While she was sparring with Gregory and withholding the Trust instrument from him, Paula decided to sell the house on Kelly Boulevard. On June 6, 2001, the Trust sold the home to the JDW Revocable Trust for $150,000. In September 2001, approximately one half of this amount was placed into an account at Merrill Lynch created for the Trust. James Hollis did not participate in the negotiation or sale of the home. Paula later represented to him that her counsel, Mr. Kelly, had not received his acceptance of the appointment as co-trustee of the Trust.

14

In October 2001, Paula created an accounting for the Trust. Paula's counsel sent the accounting to Gregory's counsel as an attachment to a letter dated October 29, 2001.[5] He did not attach a copy of the Trust instrument. He did, however, extend an offer from Paula to settle Gregory's "issues" for a one-time payment of $5,000. Gregory rejected Paula's settlement offer. Paula finally sent a copy of the Trust instrument to Gregory's counsel in or around November 2001.

HBF was not operating profitably at this time or producing much, if any, monthly income for Paula. Shortly after placing the funds from the sale of the home on Kelly Boulevard into the Trust account, on October 26, 2001, Paula submitted a claim for reimbursement to the Trust. The total amount of the claim was $71,650.50. Of this amount, $52,000 was for Paula's share of the community property allegedly used to pay down the mortgage on the home on Kelley Boulevard.

James raised an objection to a portion of Paula's claim. Paula agreed to waive the disputed portion of her claim, and on December 11, 2001, she received the sum of $68,450 as reimbursement from the Trust.

In the fall of 2002, Paula began fighting with James Hollis over the reimbursements that she was requesting from the Trust for money she was spending on Kindel. Among other things, she was requesting to be reimbursed for the expenses associated with taking her daughter on tours of more than a dozen colleges. She sent James Hollis a letter dated October 23, 2002, in which she detailed her expenses. She

---

[5] In her post-trial brief, Paula argues she complied with Texas Property Code § 113.151 by providing Gregory with an accounting. This provision, however, does not simply require that the trustee produce a document labeled as an accounting, but that she provide beneficiaries with accurate and complete information. *See Shannon v. Frost Nat. Bank of San Antonio*, 533 S.W.2d 389, 393 (Tex. Civ. App. – San Antonio, 1975) ("[I]t is well settled that a trustee owes a duty to give to the beneficiary upon request complete and accurate information as to the administration of the trust.") (citation omitted). Gregory's complaint in this case is that Paula's so-called accountings were inaccurate and incomplete.

also represented to him that Kindel and Timothy were entitled to distributions from the principle of the Trust, but Gregory could only receive distributions from income. Her representations about the terms of the distribution provisions of the Trust were false, as she well knew – Paula had drafted the distribution provisions herself.

James Hollis objected to what he perceived as Paula's use of the Trust as her personal checking account. The record contains lengthy letters and electronic messages exchanged by Paula and James regarding the Trust. Paula repeatedly stated to James Hollis, in various ways and in various messages, that the money in the Trust was hers and it was not his place to tell her how to spend it.

In addition to the proceeds from the home on Kelly Boulevard, which Paula had already withdrawn, the Trust contained the cash that was in HBF's operating account at Merrill Lynch. This account contained $142,241 as of July 30, 1999. According to the first annual accounting prepared by Paula in early 2003, the Trust held $169,583.10 in cash on October 26, 2001. This figure included the proceeds from the sale of the home on Kelly Boulevard, which Paula had not yet withdrawn from the Trust.

Paula spent the next several years withdrawing money from the Trust allegedly to pay for expenses relating to Kindel's education and Timothy's health. Her relationship with James Hollis deteriorated, and when she could no longer obtain James' approval of her withdrawals from the Trust, she made do with the signature of her friend, Lynda Wakefield. According to annual accountings prepared by Paula, the balance of cash held by the Trust had dropped to $97,910.31 by January 1, 2003. The balance dropped to $87,199.06 by January 1, 2004. Paula was terminated from her employment at American Business Forms sometime in 2004. She increased her demands for reimbursement from

16

the Trust during 2004 and 2005, and her annual accounting for 2005 shows that the balance of cash held by the trust had dropped to $188.24 by December 31, 2005.

Paula has maintained that the two IRAs that Ralph purported to contribute to the Trust passed to her pursuant to contractual beneficiary designations. Gregory argues that Paula breached her fiduciary duty as a trustee of the Trust by failing to convey the IRAs to the Trust. In particular, Ralph stated in the Trust instrument that he was contributing his interest in HBF's defined benefit plan and the IRA account number 093320463547831 located at N.C.N.B. to the Trust. The account statements from Merrill Lynch reflect that HBF's defined benefit plan was worth $9,652 as of July 30, 1999. The parties have not presented any evidence that this Court can locate regarding the balance of account number 093320463547831, which had moved from N.C.N.B. to First Gibralter Bank, at the time of Ralph's death.

### F. Gregory Sues Paula Hollis

Gregory sued all of the trustees of the Trust on December 27, 2002, in the district court of Dallas County, Texas. In his suit, he requested an accounting of the affairs of the Trust, disgorgement of any improper distributions, punitive damages, and his attorney's fees. Paula prepared her first accounting of the property in the Trust shortly before Gregory filed suit, and she prepared annual accountings for the next several years. Gregory questioned the accuracy of her accountings. Paula filed for bankruptcy on the eve of the scheduled trial.

In particular, Paula filed her petition for relief under chapter 7 of the Bankruptcy Code on February 20, 2009. In her Schedule I – Current Income of Individual Debtor, she stated that she was disabled and that her only income consisted of monthly

17

governmental payments in the amount of $1,435.00. She listed two IRAs in her Schedule B – Personal Property, one in the amount of $305,838.67 and another in the amount of $174,395.37. She claimed both of these IRAs as exempt in her Schedule C – Property Claimed as Exempt. After meeting with Paula pursuant to § 341(a) of the Code, the chapter 7 trustee determined that there would be no assets available for distribution to creditors.

On May 19, 2009, Gregory and James Hollis filed their Complaint asserting claims for common law breach of fiduciary duty and constructive fraud as well as statutory claims for an accounting of the property passed through Will and the Trust. *See* TEXAS PROPERTY CODE § 113.151; TEXAS PROBATE CODE § 149A.[6] The Plaintiffs request a judgment for actual and consequential damages, their attorneys' fees, and pre-judgment interest. In addition, in the parties' joint pretrial order, the Plaintiffs state that they are seeking a determination that any such judgment is not dischargeable in bankruptcy under § 523(a)(4) of the Code based on Paula's fraud or defalcation in a fiduciary capacity. *See* FED. R. CIV. P. 16(d), FED. R. BANKR. P. 7016.

## II. JURISDICTION

A proceeding seeking a determination of the dischargeability of a debt raises a core matter over which this Court has jurisdiction to enter a final order. 28 U.S.C. §§ 157(b)(2)(I) and 1334. This court may enter a final judgment, including, if appropriate, a

---

[6] In her post-trial brief, Paula focuses on the particular statutory citations in the Plaintiffs' complaint. She argues that the Plaintiffs are not entitled to any damages because they did not cite to the correct Texas statutes. Paula does not cite any legal authority in support of her argument. Indeed, the Texas Rules of Civil Procedure, like the Federal Rules of Civil Procedure, require only a plan and concise statement of a plaintiff's claim. *See* TEX. R. CIV. P. 45(b). Paula was clearly aware of the nature of the Plaintiffs' claims throughout this adversary proceeding as well as the underlying state court litigation.

monetary judgment in this matter.  *See Morrison v. Western Builders of Amarillo, Inc. (In re Morrison),* 555 F.3d 473, 478-79 (5th Cir. 2009).

## III. LEGAL DISCUSSION

### A. Ownership of Property (Texas Law)

As an initial matter, the parties dispute the ownership of the HBF stock and the $1 million IRA at Merrill Lynch.  Gregory seeks to establish that Ralph's $1 million IRA was (or should have been) included within the Trust.  Gregory alternatively seeks to establish that a 1/3 interest in the IRA passed to him pursuant to his father's Will. Gregory also argues that Paula breached her fiduciary duties by failing to transfer 1,000 shares of Paula Sanders Hollis, Inc. into the Trust.

*1.    The IRAs*

The evidence in this case shows that Ralph left Gregory a 1/3 interest in an IRA ending in account numbers 7831 in his Will.  Ralph subsequently executed the Trust and included an IRA ending in account numbers 7831 among the list of property to be included in the Trust.  Ralph transferred this IRA to several banks over the years.  The record is not completely clear on this point, but it appears he may have combined the IRA ending in account number 7831 with another IRA account.  In any event, Ralph had an IRA at Merrill Lynch that contained more than $1 million at the time of his death.

In the documents Ralph executed to establish the IRA at Merrill Lynch, Ralph designated his wife, Paula Hollis, as the beneficiary.  Ralph could have, but did not, list the Trust as the contractual beneficiary of the IRA.[7]  Beneficiaries under a trust are not

---

[7] Ralph was clearly aware of this possibility as he opened other accounts (not at issue in this proceeding) in which he designated a trust or trustee as the account holder.  It appears to the Court that Ralph named his wife, Paula, as the contractual beneficiary of the $1 million IRA in order to provide for their minor children.  In addition, even without the IRA, the Trust should have contained sufficient assets to

entitled to the assets of an IRA account unless the trust is contractually designated as the IRA beneficiary.  Moreover, an IRA account with a designated beneficiary is not probate property, but a contract in which assets pass by operation of law.  *See* TEX. PROB. CODE § 441 (providing that nontestamentary transfers "are effective by reason of the account contracts involved ... and are not to be considered as testamentary or subject to the testamentary provisions of [the Probate Code].").  The Court, therefore, concludes that Gregory does not have an interest in the $1 million IRA under the Will or as a beneficiary of the Trust.  The Court likewise concludes that Gregory does not have an interest in the IRA that was located at First Gibraltar Bank at the time of Ralph's death.

      2.    *The Stock*

With respect to HBF's stock, Gregory contends that Ralph did not actually transfer the stock to the Trust, because there are no stock certificates that reflect the Trust as the owner.  Gregory argues that the stock still belonged to his father at his death and, therefore, Paula should have distributed 200 shares to him under the Will.  Paula argues in opposition that the stock belonged to the Trust and that it has no marketable value.

Texas courts have held that a certificate of stock is not the stock in a corporation itself, but rather, a muniment of title which is evidence of the ownership of the stock. *Yeaman v. Galveston City Co.,* 167 S.W. 710, 720 (Tex. 1914); *State Board of Insurance v. Southwest Gen. Ins. Co.,* 401 S.W.2d 369, 371 (Tex. Civ. App. -- Austin 1966, writ ref'd n.r.e.).  It is not necessary for complete ownership of stock that a certificate even be issued.  *Greenspun v. Greenspun,* 194 S.W.2d 134 (Tex. Civ. App. -- Fort Worth), *affirmed,* 198 S.W.2d 82 (1946).  A subscriber of shares becomes a shareholder as soon

---

provide for payments to Gregory for a number of years as well as to pay for a significant portion of the education of Kindel and Timothy.

as the subscription is accepted by the corporation, whether or not a share certificate is issued, endorsed, or delivered to the subscriber. *Estate of Bridges v. Mosebrook*, 662 SW2d 116 (Tex. Civ. App. – Fort Worth, 1983).

Here, the parties agree that Ralph owned 800 shares of HBF when he executed the Trust documents. It appears from the absence of any stock certificates in the evidentiary record that HBF did not issue certificates to Ralph but simply recorded his ownership interest in the books of the corporation. When Ralph transferred his interest in HBF into the Trust, he met with the only other director of HBF and recorded his actions in HBF's books and records. The Court, therefore, concludes that Ralph's actions were sufficient to transfer the stock to the Trust under Texas law. *See Greenspun,* 194 S.W.2d at 137. The Court further concludes that none of HBF's stock passed to Gregory under the Will.

### B. Breach of Fiduciary Duty and Constructive Fraud (Texas Law)

The Court now turns to the Plaintiffs' claims that Paula breached her fiduciary duties as the independent executrix under the Will and as a trustee of the Trust. In order to prevail on their breach of fiduciary duty claims, the Plaintiffs must prove: (1) the existence of a fiduciary relationship between the Plaintiffs and Paula; (2) a breach by Paula of her fiduciary duties to the plaintiff; and (3) an injury to the Plaintiffs or benefit to Paula as a result of the breach. *See Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App. -- Houston [14th Dist.] 2008, pet. denied). The Plaintiffs' constructive fraud claim is derivative of their breach of fiduciary duty claim inasmuch as constructive fraud "is the breach of a legal or equitable duty that the law declares fraudulent because it violates a fiduciary relationship." *Stephanz v. Laird,* 846 S.W.2d 895, 903 (Tex.App. -- Houston [1st Dist.] 1993, writ denied).

### *1. Paula Breached Her Fiduciary Duties*

Here, Paula clearly owed fiduciary duties to Gregory.[8]  As a trustee of the Trust, she was required to administer the Trust in good faith and to perform all of the duties imposed on trustees under the common law.  *See* Tex. Trust Code § 113.051 (addressing the general duties of a trustee).  "A trustee, as a fiduciary, has equitable duties to hold and manage the property for the benefit of the beneficiaries." *Alpert v. Riley,* 274 S.W.3d 277, 291 (Tex. App. -- Houston [1st Dist], 2008).  Paula was required to meet the same fiduciary standards in her administration of Ralph's probate estate.  *See Humane Society v. Austin Nat'l Bank,* 531 S.W.2d 574, 571 (Tex. 1975); *Geeslin v. McElhenney,* 788 S.W.2d 683, 684-85 (Tex. App. -- Austin 1990, no writ).  As the court in *Geeslin* said:

> The "duties" of an independent executor are those of a trustee. He holds property interests, not his own, for the benefit of others. He manages those interests under an equitable obligation to act for the others' benefit and not his own. He is a "fiduciary" of whom the law requires an unusually high standard of ethical or moral conduct in reference to the beneficiaries and their interests. His "duties" are more than the ordinary "duties" of the marketplace. They connote fair dealing, good faith, fidelity, and integrity. He may have *additional* duties that he would not have in an ordinary business relation-a duty of full disclosure, for example, and a duty not to use the fiduciary relationship for personal benefit except with the full knowledge and consent of the beneficiaries.

*Geeslin,* 788 S.W.2d at 684-85 (emphasis in original, citations omitted).  In short, an executor or trustee of an estate is a fiduciary of whom Texas law requires an unusually high standard of ethical or moral conduct in reference to the beneficiaries and their

---

[8] In his post-trial brief, James argues that Paula owed a fiduciary duty to him under § 114.006 of the Texas Property Code.  His argument fails to acknowledge that, in 2005, the Texas Legislature re-wrote this provision.  For a trust created before January 1, 2006, the new § 114.006 only applies to act or omission that occurred on or after January 1, 2006.  *See* Tex. Prop. Code § 114.006 (historical and statutory notes).

interests.  *See id.*; *see also Street v. Skipper*, 887 S.W.2d 78 (Tex. App. -- Fort Worth 1994, writ den.).

Paula failed to live up to these standards.  She treated the Trust as her own personal bank account.  Paula effectively denied that she owed Gregory any fiduciary duty by telling him that he was not a beneficiary.  The plain language of the Trust, however, included Gregory as a beneficiary and required her to distribute funds from the income of the Trust when requested to do so by Gregory so long as those funds were "necessary or reasonable to provide for [his] health, education, maintenance and support."  The Trust further provided Paula with the discretion to distribute the principle of the Trust to the beneficiaries, including Gregory, if the net income distributed to the beneficiary was inadequate "considering all other sources of income available to such beneficiary …."  Paula did not engage in this analysis but, instead, denied Gregory access to the Trust.

Paula breached her duties as trustee of the Trust by lying to Gregory about whether he was a beneficiary under the Trust.  Paula improperly disbursed funds for unnecessary expenses – such as taking Kindel on tours of more than a dozen colleges – and she failed to consider whether Kindel and Timothy could pay the expenses she claimed on their behalf through some other source of income.  Her clear intent was to empty the Trust account before dipping into her own assets to support her children.  She improperly refused to disburse funds to Gregory by failing to even consider whether the funds Gregory requested were reasonable and necessary to meet his needs.  She deliberately misled Gregory and James Hollis about the terms of the Trust in order to hide her misconduct, prevent Gregory from making requests for distribution, and delay

Gregory and James from taking any legal action to protect the corpus of the Trust from her depredations.  The Court concludes that her conduct was not ethical or moral with respect to Gregory, who was a beneficiary under the Trust with the same entitlements to distributions of principle and income as Kindel and Timothy.

Paula also breached her duties as trustee of the Trust by failing to preserve its assets.  Paula, as the trustee of the Trust, had a duty to preserve the value of HBF.  With an appraised value of approximately $350,000, HBF was a valuable, income-producing company at the time of Ralph's death.  HBF was the most valuable asset owned by the Trust.  After Ralph died, however, Paula fired the only person besides Ralph who had worked closely with HBF's customers.  She made no attempt to preserve Gregory's knowledge and experience for the benefit of HBF, and she did not replace Gregory.  HBF dwindled under Paula's watch.  Paula ultimately transferred the burden of servicing of HBF's accounts to the same company that agreed to hire her.

In addition to her duties as a trustee, Texas law imposed the duties of obedience, loyalty, and due care upon Paula as an officer of HBF.  *See Landon v. S & H Marketing Group, Inc*., 82 S.W.3d 666 (Tex. App. — Eastland 2002, no pet.).  Paula breached those duties through her self-dealing.  Gregory could not bring an action against Paula to enforce her fiduciary duties to HBF because he was not a shareholder.  Moreover, the Trust was in no position to take action against Paula for breaching her fiduciary duties as an officer of HBF, because Paula was the self-proclaimed "head" trustee of the Trust.  Paula had free rein, and she ran the company into the ground.  Paula's conduct was, at the very least, constructively fraudulent under Texas law.

### 2. Paula's Breach Injured Gregory

Gregory was injured by Paula's breaches of her fiduciary duty. He received nothing from the Trust, which Paula depleted, and HBF is defunct.[9] The evidence, however, does not establish a precise amount of damages. In cases where damages should be awarded, but it is difficult to determine the precise sum, determination of the amount to be awarded is left to the discretion of the trier of facts. *See* 28 TEX.JUR. Damages § 14, *Effect of Uncertainty as to Amount of Damages* (collecting Texas authority). In this case, having carefully considered all of the testimony and documentary evidence, the Court concludes that Gregory has established actual damages in the amount of $120,000.

### 3. James and Gregory are Entitled to Attorneys' Fees

#### a.   James

James joined this action in an effort to force Paula to fulfill her duties as a trustee of the Trust. James has appeared in furtherance of his obligations as co-trustee. Section VII(b) of the Trust entitles James, as co-trustee, to reasonable compensation for his services and reimbursement for expenses. *See also* TEX. PROP. CODE § 114.063 (providing a general right to reimbursement from trust principle or income). Paula, however, has depleted the corpus of the Trust.

---

[9] Gregory also argues that he was injured by Paula's breach of her obligation to transfer her interest in Paula Hollis Sanders, Inc. to the Trust. Paula formed the corporation to provide professional legal services. *See* TEX. BUS. ORG. CODE § 301.003(3). Generally, a professional corporation may only issue shares to individuals who are licensed professionals. *See id.* at §§ 301.007(a), 301.004, 301.003(5), (7). In the case of a professional legal corporation, shareholders may be individual licensed professionals or domestic or foreign professional legal corporations. *See id.* Since the Trust is a not professional legal corporation, if Paula had transferred an interest in her business to the Trust, Texas law would have required the Trust to immediately terminate all financial interest in the corporation. *See id.* at § 301.008. The Court concludes that Gregory has failed to show any injury under these circumstances.

In the parties' Joint Pre-Trial Order, James and Gregory invoke the Texas Trust Code as support for their request for attorneys' fees. The Texas Trust Code authorizes an "award of costs and reasonable and necessary attorney's fees as may seem equitable and just." TEX. PROP. CODE § 114.064. Whether to award costs and attorney's fees is within the sound discretion of the court. *See Texarkana Nat. Bank v. Brown*, 920 F.Supp. 706, 708 (E.D. Tex. 1996). Here, the Plaintiffs established that Paula breached her fiduciary duties under the Trust. Paula has converted to her own use the Trust assets from which James might have otherwise sought to recover his expenses. The Court concludes that, under the circumstances, James may recover his costs and attorneys' fees from Paula under the Texas Trust Code.

### b.    Gregory

Gregory argues that he is entitled to recover his attorneys' fees from Paula under Texas Property Code § 113.151(a). Section 113.151 allows a beneficiary of a trust to demand an accounting from the trustee. "If a beneficiary is successful in the suit to compel a statement under this section, the court may, in its discretion, award all or part of the costs of court and all of the suing beneficiary's reasonable and necessary attorney's fees and costs against the trustee in the trustee's individual capacity or in the trustee's capacity as trustee." TEX. PROP. CODE § 113.151(a).

Here, Paula did not immediately provide Gregory with a copy of the Will or the Trust. She responded to his inquiries by providing him with false and self-serving information. The "accounting" Paula first provided to Gregory's attorney with a letter dated October 29, 2001, reflected her legal arguments regarding which assets were, or were not, contained in the Trust at the time of Ralph's death. She did not provide a value

26

for any of the non-cash assets held by the Trust, including the 800 shares of HBF, or disclose the value of what she had withdrawn from the Trust after Ralph's death.  The information she did provide lacked any substantiation.  Gregory sued her in order to obtain a complete and accurate accounting of the assets of the Trust.  He ultimately obtained such an accounting inasmuch as Paula was forced to produce information in order to defend herself in this adversary proceeding.  The Court concludes that, under the circumstances, good cause exists to award Gregory all of his reasonable and necessary attorneys' fees against Paula in her individual capacity pursuant to Texas Property Code § 113.151(a).

### 4.      Pre-Judgment Interest

With respect to the Plaintiffs' request for pre-judgment interest, Texas law allows such an award based on general principles of equity.  *See Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 531 (Tex. 1998). *See generally* 28 TEX. JUR.3d Damages § 208.  Pre-judgment interest is "compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment." *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 552 (Tex. 1985).  Here, the Court finds and concludes that general principles of equity support the award of pre-judgment interest.

Under Texas common law, pre-judgment interest begins to accrue on the earlier of (1) 180 days after the date a defendant receives written notice of a claim or (2) the date suit is filed. *See Johnson & Higgins of Texas, Inc.,* 962 S.W.2d at 531.  In this case, pre-judgment interest begins to accrue on June 15, 2003, which is 180 days after Gregory filed suit against Paula in Texas state court.  An equitable award of pre-judgment interest

accrues at the rate for post-judgment interest under Texas law (currently 5%), and it is computed as simple interest. *Id.  See also* TEX. FIN. CODE § 304.003(b).[10]

### C. Breach of Fiduciary Duty (11 U.S.C. § 523(a)(4))

Finally, having liquidated the Plaintiffs' claims, the Court turns to the question of whether Paula may discharge those claims through her bankruptcy case.   Under § 523(a)(4), a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" may not be discharged.  11 U.S.C. § 523(a)(4).  In construing § 523(a)(4), the Fifth Circuit has stated that this discharge exception "was intended to reach those debts incurred through abuses of fiduciary positions and through active misconduct whereby a debtor has deprived others of their property by criminal acts . . . ." *Miller v. J.D. Abrams, Inc. (In re Miller),* 156 F.3d 598, 602 (5th Cir. 1998) (citing *Boyle v. Abilene Lumber, Inc. (In re Boyle),* 819 F.2d 583,588 (5th Cir. 1987)).

Section 523(a)(4) concerns a relationship arising out of a technical or express trust.  *In re Miller,* 156 F.3d at 602 (citing *Texas Lottery Comm'n v. Tran (In re Tran),* 151 F.3d 339, 342 (5th Cir. 1998)).  As explained by the court in *McCoun v. Rea (In re Rea),* 245 B.R. 77 (Bankr. N.D. Tex. 2000):

> An express trust traditionally includes (1) an explicit declaration of a trust, (2) a defined trust res, and (3) an intent to create a trust relationship. To create an express trust, the legal and equitable title to the trust res must be separate, the former being vested in a trustee and the latter in a beneficiary. But, the express trust may be created by an express agreement, the direct acts of the parties, or a written instrument. A technical trust, on the other hand, may be imposed by law.  The trust must exist before the transactions that give rise to the claim.

*Id.* at 87 (internal citations omitted).  The Fifth Circuit has recognized that the technical or express trust requirement can be satisfied by a relationship in which trust-type

---

[10] The current rate is published by the Office of Consumer Credit Commissioner at and is available at http://www.occc.state.tx.us/pages/int rates/Index.html.

obligations are imposed pursuant to statute or common law. *LSP Inv. P'ship v. Bennett (In re Bennett),* 989 F.2d 779, 784 (5th Cir. 1993) (relying on *Angelle v. Reed (In re Angelle),* 610 F.2d 1335, 1335-41 (5th Cir. 1980)) (officer of a corporation owed common law fiduciary duty to corporation and stockholders sufficient to satisfy requirements of § 523(a)(4)). *See, e.g., Schwager v. Fallas (In re Schwager),* 121 F.3d 177 (5th Cir. 1997) (holding fiduciary relationship between general and limited partners sufficient under § 523(a)(4)); *See Moreno v. Ashworth (In re Moreno),* 892 F.2d 417, 421 (5th Cir. 1990)) (officers of corporation owe fiduciary duty to corporation and its shareholders).

Here, Paula was unquestionably a fiduciary. She was an officer of HBF and a trustee for the Trust. She controlled virtually all aspects of HBF and the Trust. James and Gregory seek to establish that their claims for damages and attorneys' fees are nondischargeble because they arise from Paula's gross mismanagement of the assets of the Trust and HBF. They assert that Paula's actions constituted fraud or, at a minimum, defalcation while engaging in a fiduciary capacity.

"Fraud" for purposes of § 523(a)(4) requires a showing of intentional deceit. *See, e.g., McDaniel v. Border (In re McDaniel),* 181 B.R. 883, 887 (Bankr. S.D. Tex. 1994); *Andrews v. Wells (In re Wells),* 368 B.R. 506, 514 (Bankr. M.D. La. 2006). Defalcation is a willful neglect of duty. *See Office of Thrift Supervision v. Felt (In re Felt),* 255 F.3d 220, 226 (5th Cir. 2001). Unlike fraud, defalcation does not require actual intent, and a debtor may be guilty of defalcation regardless whether or not accompanied by fraud or embezzlement. *Id.* The defalcation determination turns on the issue of whether a breach of fiduciary duty was "willful." *See In re Moreno,* 892 F.2d at 421. The Fifth Circuit describes the "willful neglect" of a fiduciary duty as "essentially a reckless standard."

*Schwager,* 121 F.3d at 185.  Because willfulness is evaluated objectively, it "charges the debtor with knowledge of the law without regard to an analysis of his actual intent or motive."  *In re Felt*, 225 F.3d at 226 (citations omitted).

In this case, Gregory and James established by a preponderance of the evidence that Paula committed defalcation in breach of her fiduciary duties.  Paula used both HBF and the Trust as her personal bank account.  Paula failed to retain and conserve the corpus and income of the Trust for all of its beneficiaries.  In willful violation of and disregard of her fiduciary duties and obligations as trustee of the Trust and officer of HBF, she has, through her misappropriation and defalcation, directed the assets of HBF and the Trust corpus and income to herself.

## IV. CONCLUSION

For all of the foregoing reasons, the Court concludes that the Plaintiffs have established grounds for the entry of a nondischargeble judgment against the Debtor-Defendant for (a) damages to Plaintiff Gregory Hollis in the amount of $120,000 plus pre-judgment interest, and (b) the Plaintiffs' reasonable and necessary attorneys' fees. With respect to the Plaintiffs' request for attorneys' fees, the Plaintiffs shall have **fourteen (14) days** from the entry of this memorandum opinion to submit a motion and affidavits on the amount and reasonableness of the requested fees and expenses.  The Debtor-Defendant shall file her objections to the Plaintiffs' request for attorneys' fees, if any, within **seven (7) days** of the Plaintiffs' motion.  In light of this memorandum opinion, the Debtor-Defendant's pending request for summary judgment is moot.

Signed on 03/29/2011

*Brenda T. Rhoades*          SD

HONORABLE BRENDA T. RHOADES,
CHIEF UNITED STATES BANKRUPTCY JUDGE

30